CITY OF ATLANTA *v.* WRIGHT, comptroller-general.

119　207|
125　608|

1. Ordinarily the writ of mandamus is a remedy for official inaction. It does not lie to control the conduct of an officer vested with a discretion, except where the exercise of that discretion has been so capricious or arbitrary as to amount to a gross abuse.

2. Under the act approved December 24, 1890 (Pol. Code, §§ 725–728), providing for the taxation of railroad property for municipal purposes, which adopted the system of assessment and collection prescribed by the act approved October 16, 1889 (Pol. Code, §§ 784–789), relating to the taxation of such property for county purposes, the comptroller-general must make his

assessment for municipal taxation "upon the basis of the value given by the returns." He may, in the exercise of the powers granted him by the general law (Pol. Code, §§ 807 et seq.), reject the return made by a railroad company of the value of its entire property for State taxation; and if, by means of the legal machinery provided, such property is assessed at a higher valuation than that shown by the return, the effect will be to correspondingly increase the proportionate valuation of the property in the different municipalities through which the railroad runs. But the proportion which the value of the property situated in those municipalities bears to the value of the entire property is, under the statute, determined by the return, and can not be altered by the comptroller-general.

Argued November 17, — Decided December 10, 1903.

Petition for mandamus.    Before Judge Lumpkin.    Fulton superior court.    October 14, 1903.

*James L. Mayson* and *William P. Hill*, for plaintiff.

*John C. Hart*, attorney-general, *F. G. duBignon*, and *R. C. Alston*, for defendant.

CANDLER, J.    By an act approved October 16, 1889 (Acts 1889, p. 29, Pol. Code, §§ 784 et seq.), the General Assembly undertook to "provide a system of taxation of railroad property in each of the counties of this State through which said railroads run, and to provide a mode of assessing and collecting the same." By this act it was made the duty of each railroad company in the State, on or before the first day of May of each year, to make a return to the comptroller-general, under the oath of its president or other chief executive officer, showing the following facts as they existed on the first day of April preceding: (1) the aggregate value of its whole property, (2) the value of its real estate and track-bed, (3) the value of the rolling-stock and all other personal property belonging to it, and (4) the value of the company's property in each county through which it runs. It was then provided that whenever the amount of the tax levy of any county through which the railroad runs is assessed by authority of the county, it shall be the duty of the ordinary of the county to certify the same and transmit his certificate to the comptroller-general, who shall assess the amount of the property of each railroad in every county through which it runs, in the following manner: "First, it shall be assessed upon the property located in each county, upon the basis of the value given by the returns. Second, the amount of tax to be assessed upon the rolling-stock and other personal prop-

erty is as follows : As the value of the property located in the particular county is to the value of the whole property, real and personal, of the said company, such shall be the amount of rolling-stock and other personal property to be distributed for taxing purposes to each county. The value of the property located in the county and the share of the rolling-stock and personal property thus ascertained, and apportioned to each of such counties, shall be the amount to be taxed to the extent of the assessment in each county." Pol. Code, § 786. By an act approved December 24, 1890 (Acts 1890–91; p. 152; Pol. Code, §§ 725 et seq.), the system of taxation of railroad property for county purposes prescribed by the act of 1889 was made applicable to the various municipalities in the State, through which railroads run, it being provided that the amount of property for municipal taxation should be ascertained and assessed in like manner and upon the same basis as laid down in the act relating to taxation of railroads for county purposes.

The petition in the present case was brought by the City of Atlanta in the superior court of Fulton county. It recited the enactment of the legislation above referred to, and in addition set out, in substance, the following material allegations : Certain named railroads owning track-beds and real estate in the city of Atlanta, and as such required by law to pay taxes to the city on their property, have not complied with the law in making their returns for the year 1903, the returns made being defective and illegal in the following particulars : " The value of the real estate and track-bed of said companies are not returned, or do not appear returned from the statements of returns of file from said railroad companies. The returns of said roads . . do not show the value of the property of the several companies in the city of Atlanta on the first day of April of the present year. This is the main defect in said returns of which petitioner complains. The city charges that the returns of each of said railroads show the value of the railroad tracks, including main and side tracks, and that the value placed upon the tracks, including main and side tracks, is transposed and returned as the full and true value of the tracks and track-bed. The distribution of the pro rata of the value of personal property to the city of Atlanta in said several returns appear as made by the railroad corporations themselves, instead of by the employees

and office of the comptroller-general, as required by law." The same charge is made with reference to the distribution of the value of the franchises, " to wit, that the value of the same are distributed to the City of Atlanta and other municipal corporations by the railroads or their officers . . rather than by the comptroller-general or his assistants." It is also charged that the railroad corporations return the alleged value of their whole property, real and personal, the alleged value of the entire personal property, and also the total mileage; that an arbitrary figure is then selected as the value per mile, and upon this basis the value of the property in the city to be returned for municipal taxation is fixed according to the mileage of the road in the city. In selecting a method of valuing the franchises, the comptroller-general and the officers of the railroad companies base their calculations upon the earnings of the roads, and the comptroller-general " accepts the return giving the value of their franchises upon the basis of their earning capacity, upon some per cent. unknown to petitioner, but under the legal rate of interest."

It is claimed that this method is unfair to the plaintiff and to the other municipalities concerned, and permits the roads to return a very small value for their franchises, whereas they are of great value. The plaintiff has made formal demand upon the comptroller-general that he reject the returns of the companies as not showing the value of their property within the limits of the city of Atlanta, that the scheme or system of distributing the total value of the roads to each municipality at an arbitrary valuation per mile or according to the length of the tracks situated in the municipality be discarded, and that each of the companies be required to make a return showing the value of its property in the corporate limits of the city without regard to any such arbitrary and unfair system and without regard to the value of the company's property in any other city, village, or town. This demand was refused. The method now employed, it is alleged, works a great hardship upon the city; and the petition prays for the writ of mandamus, directed to the comptroller-general, requiring him (1) to require each of the roads named to return the value of its property in Atlanta; (2) to require that these returns shall be made according to value, and not according to mileage of tracks; (3) to require that these returns be made according to value, with-

out regard to any arbitrary plan or system, and without regard to the value of the real estate of said companies in some other section of the State, and (4) to require the value of the several franchises of said roads to be returned according to value, without himself valuing or permitting the railroads to value them according to an assumed percentage based on earnings.

To this petition the comptroller-general demurred, on the grounds, (1) that the petition on its face shows that the plaintiff is not entitled to the relief asked for; (2) that the alleged omission of duty complained of involves the exercise of official discretion and judgment in its performance, and the writ of mandamus will not lie to control or interfere with such official action; and (3) that the law makes it the duty of the railroad companies to return their property for municipal taxation to the comptroller-general, but nowhere gives him the right to change, modify, or refuse such return; and the comptroller-general has no power other than to accept the return and, after receiving from the municipal authorities notice of the rate of taxation, to make the formal assessment upon the property as returned. On the hearing the court sustained this demurrer and denied the prayer for a mandamus absolute. The plaintiff excepted.

1. Mandamus is, primarily and chiefly, a remedy for official inaction. In its inception it was "a mere mandate issuing directly from the sovereign to the subject to compel the performance of the royal will; it was in no sense a judicial writ. In process of time, however, the arbitrary issue of this royal mandate fell into disuse and gave place to the judicial writ of mandamus by which the court of King's Bench at an early day assumed the right to correct and remedy official inaction." 19 Am. & Eng. Enc. L. (2d ed.) 716, 717. Blackstone says: "It issues to the judges of any inferior court, commanding them to do justice according to the powers of their office, whenever the same is delayed." 2 Cooley's Bl. * 110. It has been generally, if not universally, held, that the writ will not lie to control the discretion of an officer vested with judicial powers, or powers which, in their nature, call for the exercise of judgment in their performance. The writ "may set him in motion," but "it will not further control or interfere with his action, nor will it direct him to act in any specific manner." High's Ext. Leg. Rem. (3d ed.) § 34. "To do so would be to

substitute the judgment and discretion of the court issuing the mandamus for that of the court or officer to whom it was committed by law." 19 Am. & Eng. Enc. L. (2d ed.) 733–4. There is but one exception to the rule that the function of the writ is to set in motion, and not to control the discretion of the officer to whom it is directed, and that is where the discretion reposed in the officer has been grossly abused, or has been arbitrarily or capriciously exercised. In such a case mandamus will lie to compel the proper exercise of the powers granted. 19 Am. & Eng. Enc. L. (2d ed.) 737–9. This exception is more apparent than real, for such an exercise of power really amounts, in a legal sense, to no exercise, and the writ may still be said to only set the officer in motion. In Georgia the law as to the issuance of mandamus is contained in the Civil Code, §§ 4867–8. It is there provided that the writ may issue "whenever, from any cause, a defect of legal justice would ensue from a failure or improper fulfillment" of official duties; that "mandamus does not lie as a private remedy between individuals to enforce private rights, nor to a public officer who has an absolute discretion to act or not, unless there is a gross abuse of such discretion; but it is not confined to the enforcement of mere ministerial duties."

Applying the foregoing principles to the case at bar, it becomes necessary, in the view that we take of the issues involved, to determine whether the conduct of the comptroller-general of which the petition complains is such as to render him liable to the writ of mandamus. It will have been observed that the petition does not complain of official inaction or inertia. On the contrary, the contention is that the comptroller-general has acted, but in the wrong manner, and that the course pursued by him has resulted injuriously to the petitioner. In other words, the ground relied on for the issuance of the writ of mandamus is that whatever discretion was vested in the comptroller-general has been exercised in an arbitrary and capricious manner, and that the court should step in and direct him to act as required by law. Let us see, then, what are the powers conferred upon this officer by the act of 1889, and the subsequent act which provided a like method of assessment of railroad property for municipal taxation. The Political Code, § 786, provides that after the railroad companies shall have made their returns as prescribed in section 784, and after the or-

dinaries of the different counties through which the railroad runs shall have sent to the comptroller-general certificates of the amount of the tax levies of their respective counties, the comptroller-general shall "proceed to assess the amount of each and every railroad company's property, in each and every of said counties," and that the property located in each county shall be assessed "upon the basis of the value given by the returns." The act of 1890, relating to taxation of railroads by cities, is silent as to the duty of the comptroller-general in this respect, but provides that "all other provisions of [the act of 1889] are made applicable to the assessment and collection of taxes of railroads by municipalities upon the property of such railroads located in such municipalities, and upon the rolling-stock and other personal property." Pol. Code, § 728. It necessarily follows that so much of the act of 1889 as relates to the method of assessing the amount of property for taxation in each of the different counties is to be read into the act of 1890, and applied to the assessment of property for taxation by municipalities. It is argued by counsel for the city, that, under the general law prescribing the duty of the comptroller-general where returns which are required to be made to him are not satisfactory (Pol. Code, §§ 807, 808, 812), it was the duty of that officer in a case like the present, where, as is alleged, the return proceeded upon an entirely erroneous theory as to the system of taxation contemplated by the law, to reject it and require the railroad companies to make their returns in what it is claimed was the correct manner. It must be borne in mind that the provisions above referred to, prescribing the duty of the comptroller-general as to the rejection of unsatisfactory returns and the arbitration of differences arising therefrom, were enacted long before the passage of the act of 1889, and relate only to returns for State taxation; and while, in the absence of anything to indicate a contrary purpose, those provisions might be held to extend to subsequently-enacted legislation relative to returns to the comptroller-general for the purpose of county and municipal taxation, we do not see how such a ruling can be made in the face of the plain, unambiguous, and mandatory language of the statute that railroad property located in the different counties "shall be assessed upon the property located in each county, upon the basis of the value given by the returns." In the case of *Columbus R. Co.* v. *Wright*, 89 *Ga.* 574,

the constitutionality of the act of 1889 was before this court for review. In an exhaustive and learned opinion our lamented brother, the late Justice Lumpkin, discussed the entire scheme of the act in all its bearings. From the language used on pages 593 and 594, it is clear that the court considered the duties of the comptroller-general, in the distribution to the different counties of the amount assessed for taxation, to be purely ministerial and clerical in their character. "It is entirely immaterial," it was there said, "whether mere ministerial acts and calculations, which when correctly done and made can have but one possible result, are the work of the comptroller-general or of the county authorities. If the act provides, as we think it does, a constitutional scheme of taxation, what possible difference can it make whether the amounts upon which taxes are to be paid are arrived at by one officer or another, such amounts being necessarily the same in either event?" Again (p. 594): "Indeed under this law these corporations have one advantage over other taxpayers. Returns made to tax receivers are overlooked by the grand juries, and a system is provided for increasing the valuation of a taxpayer's property when he undervalues it. . . . No such rule is applied to railroads by this act, but their returns stand as they make them, whatever may be the law as to their returns for State taxation." In the light of this construction of the act, we fail to see how there can longer be any doubt as to the power and duties of the comptroller-general in the premises.

We would not be understood as holding that the return made by a railroad company of the value of its property in the municipalities through which its road runs is conclusive of that value, and that, where the return of the whole property for State taxation is rejected by the comptroller-general and after arbitration the property is assessed at a higher valuation than that shown by the return, the assessment for municipal taxation would be upon the valuation shown by the return. Such a ruling would, in our opinion, violate the scheme of the legislation enacted on this subject, and would place it in the power of railroad corporations to evade the payment of large sums justly due for municipal taxation. For instance, suppose the value of the entire property of a railroad company to be returned at $10,000,000 and that of its property in a given city at $500,000. The comptroller-general rejects the

return for State taxation, and after arbitration the property is assessed at $15,000,000. It would be absurd to hold that the property located in the city could only he assessed at $500,000, as originally returned. The *basis* of the value of the city property given by the returns, by which the comptroller-general must be guided, is one twentieth of the value of the entire property, and when the entire value is raised by the arbitration, the value of the different parts of the property is, by operation of mathematics, raised in like manner. This we conceive to be the spirit and scheme of the acts of 1889 and 1890, reading them, as we must, in the light of the law as it existed at the time of their passage. The proportion which the value of the property located in cities bears to the value of the entire property is fixed by the return, and can not be altered by the comptroller-general; but the positive (in distinction from the relative) value of the city property is raised whenever the value of the entire property is increased.

In the very interesting and able brief of counsel for the plaintiff in error, it is sought to show, by excerpts from newspaper reports of the debates which took place on the passage of the act of 1889, that the construction now sought to be placed on the law was the one in the legislative mind when it was enacted; and there is set out what purports to be a somewhat extended argument then made in opposition to the bill by the present senior United States senator from Georgia. While anything emanating from such a distinguished source must always command ou▓ ▓ost respectful attention, it is of course apparent that argument of this kind can not prevail in a judicial investigation. In arriving at the legislative intent in the passage of a law, this court will not consider an assertion in the brief of counsel as to what a newspaper said that a lawyer, however eminent, said the law meant at the time it was passed.

We do not deem it necessary to decide the question whether the system of distribution of railroad property for taxation employed by the comptroller-general, to compel him to abandon which the present petition for mandamus was brought, is wise, expedient, or equitable. It is sufficient that it is in substantial conformity to the law. It is not germane to the present discussion that under that system a mile of valuable urban railroad property is valued no more highly for taxation than a mile of the same railroad run-

ning through some remote and lonely village.     We fully appreciate the position of counsel for the plaintiff in error, that it is not here sought to increase by one dollar the amount returned by any railroad for taxation; but merely to change the system of distribution so that a greater proportion of the whole amount of the property will be allotted to the city.     Whether or not that system works a hardship in the present case or in similar cases we do not decide.     If it does, the remedy is in the legislature, and not in the courts.     Reading the petition in connection with the statutes which we have been considering and upon which the suit was founded, we conclude that not only has the plaintiff failed to make out a case of capricious and arbitrary abuse of discretion, but that on the other hand it is made to appear that in the acts of which complaint is made the comptroller-general had no discretion, but has followed the plain mandate of the law.     It was therefore not error to refuse a mandamus absolute.

*Judgment affirmed.     All the Justices concur.*