**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and ADAMS, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**July 16, 2012**

# In the Court of Appeals of Georgia

A12A0773. SPECTERA, INC. v. WILSON et al.

ADAMS, Judge.

Spectera, Inc. appeals the trial court's order holding that its independent eye care provider contract violates Georgia's Patient Access to Eye Care Act, OCGA § 33-24-59.12 (the "Eye Care Act"), and granting injunctive relief to Steven M. Wilson, O. D.; Cynthia J. Murray, O. D.; Jodie E. Summers, O. D.; and David Price, O. D. (collectively the "Wilson Group").

Spectera is a foreign vision care insurer providing eye care benefits to Georgia residents.[1] Spectera contracts with vision care providers in Georgia to provide eye

---

[1] In the Statement of Facts contained in its Appellant's Brief, Spectera repeatedly cites to briefs it filed below as support for its factual assertions. We take this opportunity to remind counsel that briefs are not evidence and do not supply record support for facts asserted on appeal. See *Tahamtan v. Sawnee Elec. Membership Corp.*, 228 Ga. App. 485, 485–486 (491 SE2d 918) (1997) ("[F]actual

care services to its plan members. Wilson is a licensed optometrist employed by Steven M. Wilson, O. D., P. C., doing business as Wilson Eye Center ("WEC"), which operates an eye care center in Lowndes County. McMurray, Summers, and Price are also licensed optometrists employed by WEC. Wilson, McMurray and Summers all qualified as members of Spectera's panel of approved eye care providers (the "Panel"). Price applied to join the Panel, but he has not been accepted as an approved eye care provider.

Prior to this litigation, Wilson had maintained a participating provider contract with Spectera, and thus had been a member of its Panel, since 1986. Both Wilson and McMurray have a "legacy form" of participating provider contract called a "Patriot contract," which allows them to prepare eyeglasses and eyeglass lenses for Spectera members in WEC's own optical laboratory and to obtain "covered materials" (e. g., lenses, frames and contract lenses) from any source they choose, including from WEC's own inventory. In late 2010, however, Spectera notified its legacy Patriot providers, including Wilson and McMurray, that it wished to "amend" those

assertions contained in the parties' briefs to the lower court are not evidence.") (Citations and punctuation omitted.). And it is not the job of this Court cull the record on a party's behalf to find such evidentiary support. *Walter v. Mitchell*, 294 Ga. App. 689, 691 (2) n. 13 (669 SE2d 706) (2008).

2

agreements, or as Spectera's Senior Vice President Lori Archer termed it, "to recontract" with those providers, shifting them from the Patriot contract to an independent participating provider agreement ("IPP agreement"). Under the new IPP agreement, independent providers such as the Wilson Group would be required to obtain all covered materials from Spectera's optical laboratory.[2] In contrast, Spectera's provider agreement with its retail chain providers, such as Wal-Mart, still allows those providers to obtain covered materials from any source, including their own optical laboratories (the "RCP agreement"). Wilson and McMurray never signed the new IPP agreement. And although Summers signed an IPP agreement with Spectera, WEC's chief executive officer, Kristian M. Keesling, stated that Spectera treated Summers's IPP agreement from its inception as a Patriot contract.

Wilson initiated suit[3] against Spectera, asserting that the IPP Agreement violated several provisions of the Eye Care Act, and afterwards, the insurer notified Wilson, McMurray, and Summers that it was terminating their provider agreements.

---

[2] Spectera asserts that the new IPP agreement is intended as a cost savings measure to curb the growth of premiums for its plan members.

[3] Wilson filed the initial action against Spectera on November 30, 2010. Price filed suit on March 8, 2011, and McMurray and Summers filed suit on March 18, 2011.

But after Price also sued Spectara and Summers and McMurray filed a separate suit, the trial court consolidated all three actions and entered an interlocutory injunction, with Spectera's consent, maintaining the status quo and preventing the termination of its current provider contracts with Wilson, McMurray and Summers pending resolution of the lawsuit. Several months later, however, Spectera moved to lift the injunction and asked permission to terminate its agreements with Wilson, McMurray and Summers and to notify the Wilson Group that "unconditionally, it will not contract with [any of them] in the future" under its current provider contract. The parties also filed cross-motions for summary judgment.

The trial court ultimately found that the IPP agreement violated several provisions of the Eye Care Act and granted the Wilson Group's motion for summary judgment, while denying Spectera's motions for summary judgment and to lift the interlocutory injunction. Instead, the trial court issued a permanent injunction[4] precluding Spectera from enforcing the restrictions contained in the IPP agreement,

_____

[4] The Eye Care Act provides that any person adversely affected by an insurer's violation of the Act "may bring an action in a court of competent jurisdiction for injunctive relief against such insurer and, upon prevailing, in addition to any injunctive relief that may be granted, shall recover from such insurer damages of not more than $100.00 and attorney's fees and costs." OCGA § 33-24-59.12 (e). Here, the trial court also granted each member of the Wilson Group damages in the maximum amount of $100 and attorney fees in an amount to be determined.

4

not only with regard to the Wilson Group, but also with regard to "any other licensed eye care provider on [Spectera's] provider panel" or those who had applied for admittance to the panel. The trial court later modified its injunction by suspending it "as to eye care providers other than [the Wilson Group] pending a final determination on appeal." Spectera appeals the trial court's order on the merits and also its extension of the injunction to include third party eye care providers not participating in this lawsuit.

On appeal from the grant or denial of a motion for summary judgment, we review the evidence de novo, and all reasonable conclusions and inferences drawn from the evidence are construed in the light most favorable to the nonmovant. *Congress Street Properties v. Garibaldi's*, 314 Ga. App. 143, 145 (723 SE2d 463) (2012). "Summary judgment is proper if the record evidence, including affidavits, 'show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" (Footnote omitted.) Id. An appellate court's review of the lower court's statutory construction is also de novo. *Kennedy Dev. Co. v. Camp*, 290 Ga. 257, 258 (719 SE2d 442) (2011).

1. The Wilson Group asserts that the requirement in the IPP agreement that they obtain all covered materials from Spectera (the "Materials Requirement"),

5

violated subsections (c) (2), (3), (5) and (6) of the Eye Care Act, especially when considered in conjunction with the RCP agreement, which does not contain the same requirement for retail chain providers. The trial court agreed. But Spectara argues that the trial court misinterpreted the Eye Care Act and erred in holding that the IPP agreement was in violation of its provisions.

Subsection (c) of the Eye Care Act sets out certain requirements for vision care insurers in this State and provides in pertinent part:

(c) A health care insurer providing a health benefit plan which includes eye care benefits shall:

\* \* \* \* \* \*

(2) Not preclude a covered person who seeks eye care from obtaining such service directly from a provider on the health benefit plan provider panel who is licensed to provide eye care;

(3) Not promote or recommend any class of providers to the detriment of any other class of providers for the same eye care service;

\* \* \* \* \* \*

(5) Allow each eye care provider on a health benefit plan provider panel, without discrimination between classes of eye care providers, to furnish

6

covered eye care services to covered persons to the extent permitted by such provider's licensure;

(6) Not require any eye care provider to hold hospital privileges or impose any other condition or restriction for initial admittance to a provider panel not necessary for the delivery of eye care upon such providers which would have the effect of excluding an individual eye care provider or class of eye care providers from participation on the health benefit plan . . . .

OCGA § 33-24-59.12 (c).

The parties disagree as to the legislative intent behind and proper interpretation of these provisions. Although our consideration of the Eye Care Act presents a matter of first impression, our starting point, as with any legislation, is the language of the statute itself. Thus, "[w]e begin our analysis with the 'golden rule' of statutory construction, which requires us to follow the literal language of the statute unless it produces contradiction, absurdity or such an inconvenience as to insure that the legislature meant something else." (Citation and punctuation omitted.) *Telecom\*USA v. Collins,* 260 Ga. 362, 363 (393 SE2d 235) (1990). We are also guided by several other well-established canons of statutory instruction:

In all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly. When the language of a statute is

plain and unambiguous and not leading to an absurd result, it evidences the legislative intent which is not to be contravened. We also must endeavor to give each part of the statute meaning and avoid constructions that make some language mere surplusage or meaningless. Furthermore, a statute must be construed in relation to other statutes of which it is a part, and all statutes relating to the same subject-matter, briefly called statutes in pari materia, are construed together, and harmonized wherever possible, so as to ascertain the legislative intendment and give effect thereto.

(Citations and punctuation omitted.) *Northeast Georgia Cancer Care v. Blue Cross and Blue Shield of Georgia*, __ Ga. App. __ (1) (Case No. A11A1871, decided March 28, 2012). Accordingly, we apply these principles to the parties' arguments regarding the application of the Eye Care Act in this case.

(a) *Subsection (c) (2)* – The Wilson Group contends that the Materials Requirement in the IPP agreement violates subsection (c) (2) of the Eye Care Act by preventing a covered person from obtaining eye care services "*directly* from a provider on the health benefit plan provider panel who is licensed to provide eye care." (Emphasis supplied.) OCGA § 33-24-59.12 (c) (2).

The Wilson Group maintains its own optical laboratory where they prepare eyeglasses and eyeglass lenses for their patients, including Spectera plan members.

8

They also sell contact lenses from their own inventory. Wilson contends that this practice allows the Wilson Group to control the timeliness and quality of the eye care they provide their patients and that the same level of care will not be possible if they are required to rely upon Spectera's lab. Wilson bases this assertion on his prior experience with Spectera, before the implementation of the Patriot contract, when the insurer required its providers to accept eye care furnished by Spectera.

Under the IPP agreement, independent providers are entitled to provide "comprehensive eye examinations" and engage in the "professional and courteous dispensing and fitting of eyeglasses and/or contact lenses," but when a laboratory is required to provide "services and products," including presumably the preparation of eyeglasses and contact lenses, the provider would be required to use Spectera's "optical materials fullfillment system." As Spectera represented this arrangement in an unsuccessful attempt to remove this action to federal court,[5] the materials must be purchased from Spectera's optical laboratory, rather than the participating providers, and the providers no longer receive copays from the patients or payment from Spectera for such materials. Consequently, the patient effectively is required to

_____

[5] See *Wilson v. Spectera*, 2011 WL 1002694, *2 (M. D. Ga. 2011).

9

purchase materials, including prepared eyeglasses and contact lenses, directly from Spectera.

Among the eye care services Georgia law allows optometrists to provide is the preparation and dispensing of eyeglasses and contact lenses. See OCGA § 43-30-1 (2) (A) ("The practice of optometry consists of . . . the correction of visual anomalies through the prescribing, employment, and use of lenses, prisms, frames, mountings, contact lenses, . . . and any other means or methods for the relief, correction, or remedy of any insufficiencies or abnormal conditions of the human visual organism . . . ."); 1980 Op. Atty. Gen. 41 (recognizing that an optometrist "may prepare and dispense optical devices" as indeed such devices require the prescription of an optometrist or physician). Because the IPP agreement would prohibit Spectera's insureds from obtaining at least some of these eye care services directly from the Wilson Group, we agree with the trial court that Materials Requirement violates subsection (c) (2) with regard to independent optometrists. We make no finding, however, as to whether the enforcement of the IPP agreement would also violated subsection (c) (2) with regard to independent ophthalmologists or independent opticians as those issues are not before us.

10

Spectera asserts, however, that the legislature's intent in enacting subsection (c) (2) was to give patients the right to seek eye care directly from a provider without requiring a physician's referral; thus, it argues that the provision was not intended to regulate where an independent provider procures its covered materials. But the language of the statute contains no such limitation, and Spectera provides no support for this argument other than a newspaper article indicating that the proposed Eye Care Act would require insurers to allow patients to seek eye care without a physician referral. Even acknowledging that the Act may have had the effect of eliminating any requirement for physician referrals, the newspaper article does not and cannot speak to the legislature's intent in passing the law. See *City of Atlanta v. Wright*, 119 Ga. 207, 215 (1) (45 SE 994) (1903) ("In arriving at the legislative intent in the passage of a law, this court will not consider an assertion in the brief of counsel as to what a newspaper said that a lawyer, however eminent, said the law meant at the time it was passed."). Rather, we are guided by the statute itself, which contains no language limiting subsection (c) (2) to such a purpose, and which in fact, makes no mention of physician referrals.

In contrast, in other health care legislation when the General Assembly intended to eliminate the requirement for physician referrals, it has expressly done so.

11

See e. g., OCGA § 33-24-56 (c) ("No health benefit policy . . . shall require as a condition to the coverage of dermatological services that an enrollee, subscriber, or insured first obtain a referral from a primary care physician. . . ."); OCGA § 33-24-59 (c) ("No health benefit policy . . . shall require as a condition to the coverage of services of an obstetrician or gynecologist . . . that an enrollee, subscriber, or insured first obtain a referral from another physician. . . ."). Even if the elimination of a physician referral requirement was an intended effect of the Eye Care Act, we cannot assume from the provisions's language that it was the sole intent. The legislature knew how to draft a statute with the specific aim of eliminating the requirement of a physician referral when it chose to do so, and we must presume that the legislature's failure to specifically address physician referrals or otherwise limit the language under subsection (c) (2) was "a matter of considered choice." (Citations and punctuation omitted.) *Deutsche Bank Nat. Trust Co. v. JP Morgan Chase Bank,* 307 Ga. App. 307, 311 (1) (b) (704 SE2d 823) (2010). See also *Dan River, Inc. v. Shinall,*186 Ga. App. 572, 573-574 (367 SE2d 846) (1988) (if intent of legislature was to limit purpose of statute, the legislature presumably would have expressed that intent in language similar to that employed in other statutes).

Accordingly, we affirm the trial court's grant of the Wilson Group's motion for summary judgment and its denial of Spectera's motion for summary judgment as to subsection (c) (2).

(b) *Subsectons (c) (3) and (c) (5)* – The Wilson Group argues that the Materials Requirement also amounts to a discriminatory practice that serves to promote chain providers to the detriment of independent providers in violation of subsection (c) (3) and (c) (5) of the Act. OCGA § 33-24-59.12 (c) (3), (5).

While subsection (c) (3) expressly prohibits the promotion of "any class of providers" over another and subsection (c) (5) requires that insurers allow providers, "without discrimination between classes of eye care providers," to furnish eye care services to the extent permitted by the provider's licensure, the Eye Care Act fails to provide any definition for the phrase "class of providers" or the phrase "classes of eye care providers" as used in the statute. The Wilson Group argues that independent providers represent a class separate from retail chain providers. But Spectera argues that these provisions are referring to the three levels of eye care providers under Georgia's licensure laws – ophthalmologists, optometrists, and opticians.[6]

---

[6] Ophthalmologists, like other physicians in Georgia, are licensed by the Georgia Composite State Board of Medical Examiners. OCGA §§ 43-34-21, 43-34-35; Ga. Comp. R. & Regs. 360-2-.02. Optometrists are licensed by the Georgia State

In the absence of a definition, we fall back upon the standard canon of statutory construction providing that "[i]n all interpretations of statutes, the ordinary signification shall be applied to all words, except words of art or words connected with a particular trade or subject matter, which shall have the signification attached to them by experts in such trade or with reference to such subject matter." OCGA § 1-3-1 (b). Spectera has not pointed us to any authority establishing that "class of providers" or "classes of eye care providers" is a term of art within the health care industry strictly defined as a distinction based upon licensure.[7] Nor do these

_____

Board of Examiners in Optometry. OCGA §§ 43-30-1, 43-30–7; Ga. Comp. R. & Regs. 430-2-.01, while opticians are licensed by the Georgia State Board of Dispensing Opticians. OCGA §§ 43-29-1, 43-29-10; Ga. Comp. R. & Regs. 420-2-.01

[7] Although Spectera points to similar statutes enacted in Tennessee and Utah, which define "class of providers" on the basis of license or certification , those statutes expressly define the phrase "class of providers" as distinguishing between licensures or professions. The Tennessee law specifically prohibits discrimination "as to any provider within a class of providers" "solely on the basis of the license or certification" and defines "class of providers" to mean "optometrists, ophthalmologists, podiatrists and chiropractors." Tenn. Code Ann. § 56-32-129 (a), (b). The Utah law prohibits insurers from "unfairly discriminat[ing] between classes of health care providers," and defines "class of health care providers" as "all health care providers licensed or licensed and certified by the state within the same professional, trade, occupational, or facility licensure or licensure and certification category . . . ." Utah Code Ann. § 31A-22-617 (2) (a), (e). In contrast, OCGA § 33-24-59.12 neither defines nor purports to limit the term "class of providers" to a classification based upon licensure or certification.

14

provisions expressly limit the classes of providers to ophthalmologists, optometrists and opticians. Subsection (c) (3) makes reference to "*any* class of providers" without limitation. (Emphasis supplied.) Although subsection (c) (5) requires an insurer to allow eye care providers, "without discrimination between classes of eye care providers, to furnish covered eye care services . . . to the extent permitted by such provider's licensure," we conclude that the reference to licensure in that language refers to the form of eye care services that a particular provider is authorized to provide, and does not modify or refer to "classes of eye care providers." OCGA § 33-24-59.12 (c) (5). Notably, when the statute seeks to reference optometrists and ophthalmologists, it does so expressly. Subsection (c) (7), for example, makes specific reference to "optometrists and ophthalmologists," requiring that both be included on an insurer's provider panel "in a manner that ensures plan enrollees timely access and geographic access." OCGA § 33-24-59.12 (c) (7).

"In the absence of words of limitation, words in a statute should be given their ordinary and everyday meaning." (Citations and punctuation omitted.) *Risser v. City of Thomasville*, 248 Ga. 866 (286 SE2d 727) (1982). See also *Flott v. Southeast Permanente Medical Group*, 288 Ga. App. 730, 732 (1) (655 SE2d 242) (2007) ("It is a fundamental rule of statutory construction that where the language of a statute is

15

plain and unambiguous, the terms used therein should be given their common and ordinary meaning.") (Citations and punctuation omitted.). Thus we apply the ordinary signification to the words of the statute and interpret the word "class" to mean "a group . . . sharing common attributes"[8] or a "group . . . containing members regarded as having certain attributes or traits in common; a kind or category."[9] Applying this meaning, we conclude that class of providers as used in the Act is not based merely on licensure, but is broad enough to encompass a class of independent providers, or a class of independent optometrists, as well as a class of retail chain providers or retail chain optometrists.

(i) The Wilson Group thus argues that the Materials Requirement violates subsection (c) (3) of the act because it has the effect of promoting the retail chain provider class to the detriment of the independent provider class by allowing the retail chain providers more control and by allowing them to provide timelier service to Spectera members. But we find that the word "promote" as used in subsection (c) (3) is capable of more than one meaning even under common and ordinary usage. On the

---

[8] Merriam–Webster Online (11th Ed. 2012), http://www.merriam-webster.com/dictionary/class.

[9] The American Heritage Dictionary of the English Language (5th Ed. 2011), http://ahdictionary.com/word/search.html?q=class

16

one hand, it can mean "to contribute to the growth or prosperity of, [to] further"[10] as the Wilson Group apparently interprets it. On the other hand, it can also mean "to present . . . for buyer acceptance through advertising, publicity, or discounting"[11] or "to attempt to sell or popularize by advertising or publicity."[12]

> These definitions cannot be easily reconciled for our purposes, and thus
>
> [m]erely compiling a number of possible dictionary definitions, . . . does not end our task, for statutes are to be construed in accordance with their real intent and meaning and not so strictly as to defeat the legislative purpose. Therefore, we must read OCGA § [33-24-59.12 (c) (3)] according to its natural and most obvious import of the language without resorting to subtle and forced constructions for the purpose of either limiting or extending its operation.

(Citations omitted.) *In the Interest of T. H.*, 258 Ga. App. 416, 420 (574 SE2d 461) (2002). And "the meaning of a statutory clause depends upon the intention with which it is used as manifested by its context and considered with reference to the subject matter to which it relates. [Cit.] In this sense, we note that ["promote"] is

---

[10] Merriam Webster Online, http://www.merriam-webster.com/dictionary/promote; American Heritage Dictionary, http://ahdictionary.com/word/search.html?q=promote.

[11] Merriam Webster Online, supra.

[12] American Heritage Dictionary, supra.

17

coupled with ["recommend"] in the Code section." Id. And the next subsection of the statute requires that all providers on its provider panel be included on any publicly accessible list of participating providers for a particular plan. OCGA § 33-24-59.12 (c) (4). Given this context, we conclude that "promote" as used in subsection (c) (3) means to present one class of providers for acceptance by Spectera's covered members over another class through advertising or other means, rather than to further or advance one class over another by giving one class a commercial advantage over the other.

The Wilson Group has not pointed us to any evidence that through the IPP agreement, Spectera would present its retail chain providers for acceptance by its members over its independent chain providers. No evidence exists, therefore, that Spectera has violated subsection (c) (3) of the Eye Care Act. Accordingly, we reverse the trial court's order granting the Wilson Group's motion for summary judgment and injunctive relief as to subsection (c) (3) and further reverse the trial court's denial of Spectera's motion for summary judgment as to that subsection.

(ii) The Wilson Group also argues that the Materials Restriction in the IPP Agreement violates subsection (c) (5) of the Eye Care Act. That provision mandates that an insurer allow each eye care provider on its panel "to furnish covered eye care

18

services to covered persons to the extent permitted by such provider's licensure," without discrimination between classes of eye care providers. As discussed in division 1 (a) above, the IPP agreement would not allow independent optometrists to provide eye care services to the extent permitted by their licensure. Optometrists are allowed under Georgia law to both prepare and dispense eyeglasses and contact lenses, but under the IPP agreement, independent optometrists are required to obtain prepared eyeglasses and lenses from Spectera to dispense to Spectera members. But optometrists employed by retail chains are allowed to both prepare and dispense these materials. Thus, we agree with the trial court that the evidence supports a finding that the IPP agreement violates subsection (c) (5) with regard to independent optometrists. We make no finding, however, as to whether the enforcement of the IPP agreement would also violate subsection (c) (5) with regard to independent ophthalmologists or independent opticians as those issues are not before us.

Accordingly, we affirm the trial court's grant of the Wilson Group's motion for summary judgment and its denial of Spectera's motion for summary judgment with regard to subsection (c) (5).

(c) *Subsection (c) (6)* – Subsection (c) (6) prohibits insurers from imposing any restriction for initial admittance to a provider panel, if the condition or restriction "is

19

not necessary for the delivery of eye care." OCGA § 33-24-59.12 (c) (6). Price contends that Spectera violated subsection (c) (6) of the Eye Care Act by excluding him from becoming a participating provider on the Panel solely because he refused to sign the IPP agreement containing the Materials Requirement. Spectera counters that no violation occurred because the Materials Requirement did not impose a disqualifying condition for Panel membership. We are unpersuaded by this contention.

The parties agree that the Eye Care Act does not guarantee admittance to a provider panel because an insurer may exclude an applicant based upon a condition or restriction necessary to the delivery of eye care. But the evidence demonstrates no reason for Price's exclusion from the Panel other than his failure to sign the IPP agreement and his affiliation with WEC at a time when one of its members had sued Spectera over the agreement. Spectera argues that Price's failure to sign the IPP agreement is not a condition, but merely a failure to complete the application process. But this argument only underscores that agreeing to the Materials Requirement is a condition precedent to membership on Spectera's Panel. Because signing the IPP agreement containing the Materials Requirement cannot be considered a condition necessary for the provision of eye care and because we have held that the Materials

20

Requirement violates at least two provisions of the Eye Care Act, Price established his claim that Spectera unlawfully utilized an improper condition to exclude him from his initial admittance to the Panel in violation of subsection (c) (6). Accordingly, we affirm the trial court's grant of summary judgment to Price and its denial of summary judgment to Spectera as to subsection (c) (6).

2. Spectera also contends that the scope of the trial court's injunctions is overly broad in that the injunctions prevent Spectera from enforcing its IPP agreement as to any independent vision care provider on its Panel, even though this case was not brought as a class action and the other providers were not parties to the lawsuit.

OCGA § 9-11-65 (d) provides that an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them" with proper notice. But Spectera is a party to this lawsuit and is the only party enjoined in this case and thus the only party bound by the injunction. And because the injunction is based upon an explicit finding that the IPP agreement violates subsection (c) (2) and (c) (5) of the Eye Care Act as to independent optometrists and violates subsection (c) (6) to the extent that optometrist applicants are denied membership on the sole basis of their refusal to sign the unlawful agreement, any attempt by Spectera to enforce the

21

agreement as to any optometrist currently on, or applying to become a member of, its Panel would violate Georgia law. We conclude, therefore, that the trial court could properly enjoin Spectera as a party to this lawsuit from further violations of the law even with regard to non-party optometrists. Cf. *Cawthon v. Douglas County*, 248 Ga. 760, 764 (2) (286 SE2d 30) (1982) (affirming injunctive relief to prevent defendant from further violations of county zoning ordinance because other remedies at law "would not be as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity.") (Citation and punctuation omitted.).

Nevertheless, given our holdings in division 1 above, we reverse the remaining injunctions to the extent that they prohibit the enforcement of the IPP agreement as to independent providers other than optometrists on the Spectera panel or to applicants other than optometrists seeking admission to the Spectera Panel, as no ruling could be issued as to such providers on the record in this case.

*Judgment affirmed in part and reversed in part. Ellington, C. J., and Phipps, P. J., concur.*