**WHOLE COURT**

**NOTICE:** Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 29, 2013**

# In the Court of Appeals of Georgia

A12A2448.   UWORK.COM, INC. et al. v. PARAGON TECHNOLOGIES, INC.

A12A2449.   PARAGON TECHNOLOGIES, INC. v. UWORK.COM, INC. et al.

McMILLIAN, Judge.

Plaintiff Paragon Technologies, Inc. ("Paragon") subcontracted with Defendant UWork.com, Inc. d/b/a Covendis Technologies ("Covendis") to supply temporary IT consultants to the State of Georgia. These companion appeals arise out of a series of business disputes between Paragon and Covendis regarding background checks for the consultants, the payment of subcontractors hired by Paragon, and Paragon's billing rates. In Case No. A12A2448, Covendis appeals the trial court's order granting summary judgment to Paragon on Paragon's breach of contract claims and on Covendis' breach of contract and fraud counterclaims. Additionally, Covendis and

its CEO appeal the trial court's denial of summary judgment to them on Paragon's breach of fiduciary duty claim. In Case No. A12A2449, Paragon appeals the trial court's order granting summary judgment to Covendis, its CEO, and one of its client care managers on Paragon's claims for fraud and negligent misrepresentation. For the reasons discussed below, we affirm in part and reverse in part in Case No. A12A2448, and affirm in Case No. A12A2449.

> Summary judgment is appropriate if the pleadings and the undisputed evidence show that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). On appeal from the grant or denial of summary judgment, the appellate courts conduct a de novo review, construing all reasonable inferences in the light most favorable to the nonmoving party.

(Citations omitted.) *Bank of North Ga. v. Windermere Dev., Inc.*, 316 Ga. App. 33, 34 (728 SE2d 714) (2012). Guided by these principles, we turn to the record in the present case.

*Covendis' Vendor Management System.* In 2007, Covendis entered into a contract, subject to renewal on an annual basis, to develop and implement a web-based tool for managing temporary IT staffing for the State of Georgia. The web-based tool developed by Covendis, the "Vendor Management System" ("VMS"),

listed state agencies that were in need of independent contractors to perform IT work. All companies or persons that wanted to perform IT work for those state agencies were required to enter into "supplier agreements" with Covendis to procure work through the VMS.

Once a company entered into a supplier agreement with Covendis, it gained access to the VMS, where Covendis would post the specifications and requirements for the IT positions that the state agencies sought to fill. If a supplier wished to provide IT staff for a posted position, it would submit a proposal through the VMS containing the necessary pricing information. If the state agency accepted the proposal and the supplier staffed the position, the supplier thereafter would enter the VMS and submit its time and expenses for services rendered. Covendis then would invoice the State for the services provided by the supplier, the State would pay Covendis the amount owed in the invoice, and Covendis would remit payment to the supplier within a specified time frame.

*The Supplier Agreement between Covendis and Paragon.* Beginning in 2007, Paragon entered into a supplier agreement with Covendis on an annual basis to provide temporary IT staff to the State through the VMS (the "Supplier Agreement"). In addition to supplying IT staff through its own employees, Paragon entered into

3

agreements with a number of subcontractors to supply IT staff to the State. Under the Supplier Agreement, Paragon was required to provide Covendis with background verification reports on IT workers supplied to the State and to submit the names of its proposed subcontractors for Covendis' review and approval.

*The March Agreement.* From 2007 through October 2009, the business relationship between Covendis and Paragon was predictable and stable. But beginning in October 2009, Covendis became concerned that Paragon was providing it with false background verification reports about its IT staff. After conducting an investigation and concluding that Paragon was submitting false background verifications, Covendis sent notice to Paragon in February 2010 that it was terminating the Supplier Agreement. After receiving the notice, Paragon contacted Covendis and entered into negotiations over the issue of termination. During the negotiations, Paragon continued to supply IT staff to the State.

On March 1, 2010, the parties settled their dispute over the background verifications (the "March Agreement"). The parties agreed that the provisions of the Supplier Agreement would "continue in full force and effect," except to the extent that they conflicted with the March Agreement. Under the March Agreement, Paragon was permitted to continue serving as a supplier under the Supplier Agreement on a

4

probationary basis for six months. If Paragon did not materially breach the Supplier Agreement during the probationary period, its reinstatement as a supplier would become permanent through the remaining term of the Supplier Agreement.

Pursuant to the March Agreement, Paragon agreed to pay $25,000 to Covendis, to submit new background verifications for specified workers, and to pay an increased administrative fee to the State of Georgia Department of Administrative Services. Paragon also agreed to limit the total "markup" it could charge the State by implementing a "28% margin cap" on its own employees and a "35% margin cap" on workers provided by its subcontractors, effective April 1, 2010.[1] The March Agreement gave Paragon until March 31, 2010 "to renegotiate and finalize all rates to follow the bill rate guidelines set." In return, Covendis agreed to the probationary reinstatement of Paragon as a supplier and also agreed to release any claims against Paragon relating to the background verifications.

---

[1] Covendis asserts that the margin caps were intended to achieve additional savings for the State of Georgia for services provided by Paragon by cutting the fee Paragon took for each hour that a contractor worked. And according to Tsao, at a meeting on April 20, 2010, Paragon's representatives suggested that they maintain the March 1, 2010 billing rates and instead provide a six percent discount to the State, but Covendis refused the offer because it would not lower the billing rates as much as the margin caps. But Paragon denies that Covendis ever told it, either before the March Agreement was signed or after, that this was the intent of the margin caps.

5

*The Subcontractor Pay Dispute.* In addition to the parties' dispute over the background verifications, a dispute arose over Paragon's payment of its subcontractors. Around February 2010, two of Paragon's subcontractors began complaining to Covendis that they were not receiving payment from Paragon for IT work performed for the State. Paragon contends that it was slow in making payments to its subcontractors during this period because Covendis had been slow in remitting payment to Paragon. According to Paragon, however, Covendis misrepresented to the subcontractors that Paragon was the source of the failure to pay because Paragon had already been paid by Covendis. Paragon also contends that Covendis falsely told the subcontractors that Paragon was no longer an approved supplier with the State.

Covendis denies making any misrepresentations to Paragon's subcontractors and presents a different version of events. Covendis contends that under the Supplier Agreement, Paragon was required to pay its subcontractors whenever it received a payment from Covendis, even if the payment only partially satisfied a Paragon invoice. According to Covendis, when the subcontractors began complaining about nonpayment on certain invoices, Covendis searched its records and discovered that it had already made payments to Paragon on those invoices.

6

In April 2010, the two subcontractors ended their contractual relationship with Paragon and entered into their own supplier agreements with Covendis. That same month, Paragon began withholding payments to several of its subcontractors on the ground that they had materially breached their subcontractor agreements by, among other things, attempting to contract directly with Covendis rather than through Paragon.[2]

*The Margin Cap Dispute.* A dispute also arose between the parties regarding the margin cap imposed by the March Agreement and how to interpret it. On March 8, 2010, Paragon submitted a signed wage and rate statement that verified the 2009 pay rates that were in effect as of March 1, 2010. Tsao stated that this rate schedule was to be adjusted in accordance with the margin caps in the March Agreement to create the new billing rates.

Two days later, on Thursday, April 22, 2010, an e-mail exchange began between the parties addressing some of these outstanding issues. Paragon's claim for breach of fiduciary duty originates from these e-mails. Madhu Iyer, the CEO of

[2] The dispute over payment led to several lawsuits between Paragon and its subcontractors that are not at issue in the present litigation. See, e. g., *Paragon Technologies, Inc. v. InfoSmart Technologies, Inc.*, 312 Ga. App. 465 (718 SE2d 357) (2011) (addressing restrictive covenant in contract between Paragon and one of its subcontractors).

Paragon, sent the first e-mail to Tsao expressing Paragon's "disappoint[ment]" that Covendis had entered into independent agreements with two of its subcontractors. Late that evening, Tsao replied that Covendis had no choice but to enter into such interim contracts in order to ensure continuity of business for its client because Paragon had not provided Covendis with copies of the re-negotiated subcontractor agreements in compliance with the March Agreement. Tsao requested copies of such agreements. He followed up with a second e-mail less than one hour later, which provided:

> Per the terms of our March 1st [A]greement, Paragon was to have provided Covendis with the new rates that were to be effected April 1st per the terms of the agreement. To date, we have not yet received them.

> Thank you for sending them, *and we shall adjust the rates in the system* effective April 1st, which will be reflected in the next invoice.

(Emphasis supplied.) Paragon asserts that Tsao's statement that Covendis would make the adjustments in the system was an undertaking of a special agency on Paragon's behalf. Iyer replied the following Monday, April 26, 2010, that Paragon had received the request for the subcontractor agreements and "the new bill rate/pay

rates." She stated that Covendis "should have [this] information sent to you by EOB[3] Wednesday, April 28th."[4] But Iyer never expressly responded to Tsao's statement that it "shall adjust the rates in the system."

It appears from the record that on April 28, 2010, Covendis began entering revised rates for Paragon's subcontractors into the VMS at around 5 p.m., although Paragon had not yet provided its new rates to Covendis. Iyer sent Tsao an attachment with Paragon's revised rates and subcontractor agreements. At 6:15 p.m., Tsao replied, explaining that it had adjusted Paragon's contracts in the VMS with new billing rates based on the earlier verification of the 2009 rates, and not on Paragon's revised pay rates. Iyer responded at 6:53 p.m. that the system did not reflect the rates submitted by Paragon, and thus the rates shown on the system "are incorrect and Paragon has not accepted these rates." Iyer asked Tsao to "[p]lease change the rates per the attached revised rates sent to Covendis and correct the system accordingly to reflect these rates immediately." Tsao and Covendis refused this and subsequent

---

[3] "EOB" presumably means "end of business" in this context.

[4] The dissent's proposed construction of these e-mails as creating an agency relationship is belied by the e-mails themselves, which are attached hereto as Appendix A.

9

requests by Paragon to change the rates, contending that Paragon's revised rates did not comply with the margin caps in the March Agreement.

Despite the parties' disagreement over the rates and the margin cap, Paragon continued to supply IT staff to the State over the ensuing months. Based on the rates entered into the VMS by Covendis, the State paid lower billing rates to Paragon than it would have under the higher rates that Paragon had submitted to Covendis for entry in the VMS. Paragon invoiced Covendis for the difference in the rate submitted by Paragon and the rate entered in the VMS by Covendis, but Covendis refused to pay those invoices.

*Withheld Payments from the State.* After the parties began arguing over subcontractor pay and the margin cap, Covendis received payments from the State for work performed by Paragon's subcontractors that Covendis did not remit to Paragon. Covendis took the position that Paragon was in material breach of its contractual obligations based on its alleged failure to properly pay its subcontractors or submit billing rates with the appropriate margin cap, thereby excusing Covendis from remitting the payments to Paragon.

*The Lawsuit.* In July 2010, the parties' ongoing dispute over the payment of subcontractors and the margin cap culminated in Covendis sending a letter to Paragon

10

claiming that it was in material breach of the Supplier Agreement and March Agreement and suspending Paragon from any further work as a supplier. That same month, Paragon filed the present suit against Covendis for breach of the Supplier Agreement and the March Agreement; against Covendis, Raymond Tsao (Covendis' CEO), and Patrick Crowley (one of Covendis' client care managers) for fraud and negligent misrepresentation; and against Covendis and Tsao for breach of fiduciary duty.[5] Paragon sought compensatory damages, attorney fees, and punitive damages.

Covendis answered and filed counterclaims for breach of contract and fraud. Covendis also paid into the court registry over $300,000 that it had received from the State for work that had been performed by Paragon-supplied staff beginning in the spring of 2010 but that it had been withholding from Paragon on the ground that Paragon had materially breached its contractual obligations.

Both parties moved for partial summary judgment on various claims and counterclaims. Following discovery, the trial court entered a detailed order addressing the opposing summary judgment motions. The trial court granted summary judgment in favor of Paragon on Covendis' counterclaims for breach of contract and fraud;

---

[5] Paragon initially asserted claims against Covendis for tortious interference with contract and defamation but later withdrew them.

11

granted summary judgment in favor of Paragon on its breach of contract claim pertaining to the approximately $300,000 paid into the court registry by Covendis;[6] and granted summary judgment in favor of Covendis, Tsao, and Crowley on Paragon's claims for fraud and negligent misrepresentation. The trial court denied summary judgment to Covendis and Tsao on Paragon's claims for breach of fiduciary duty and punitive damages. These companion appeals followed.

*Case No. A12A2448*

1. *Covendis' Counterclaim for Breach of Contract.* Covendis maintains that the trial court erred in granting summary judgment to Paragon on Covendis' counterclaim for breach of contract. In its counterclaim, Covendis asserted that Paragon breached the Supplier Agreement and March Agreement by (a) refusing to apply the agreed-upon margin caps to its billing rates; (b) failing to pay its subcontractors; and (c) submitting false background verification reports for its IT staff.

---

[6] In addition to its breach of contract claim pertaining to the money paid into the court registry, Paragon asserted breach of contract claims against Covendis for failure to make timely payments to it under the Supplier Agreement and for breaching the March Agreement in various respects. Neither party moved for summary judgment on these additional breach-of-contract claims, which remain pending in the trial court.

12

"The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." (Punctuation and footnote omitted.) *Norton v. Budget Rent A Car System*, 307 Ga. App. 501, 502 (705 SE2d 305) (2010). A breach occurs if a contracting party repudiates or renounces liability under the contract; fails to perform the engagement as specified in the contract; or does some act that renders performance impossible. *Bd. of Regents of the Univ. System of Ga. v. Doe*, 278 Ga. App. 878, 887 (3) (630 SE2d 85) (2006).

When a court construes contractual terms to determine if a breach has occurred, "the cardinal rule of contract construction is to ascertain the intention of the parties." (Punctuation and footnote omitted.) *Board of Commrs. of Crisp County v. City Commrs. of City of Cordele*, 315 Ga. App. 696, 699 (727 SE2d 524) (2012). And if the contractual terms are plain and unambiguous, those terms alone determine the parties' intent. Id. The construction and legal effect of a contract is an issue of law subject to de novo review on appeal. *Parris Properties, LLC v. Nichols*, 305 Ga. App. 734, 735 (1) (700 SE2d 848) (2010). Mindful of these principles, we address Covendis' three allegations of breach of contract by Paragon.

(a) *Margin Caps.* The margin cap provision of the March Agreement states:

Paragon will implement the standard bill rate calculations of 28% margin cap on W-2 workers, and a 35% margin cap on workers provided by subcontractors effective April 1, 2010. (For subcontractors, this means the total markup by the subcontractor and by Paragon combined may not exceed 35%). Paragon will have until March 31, 2010 to renegotiate and finalize all rates to follow the bill rate guideline set. Paragon will notify Covendis on the new billing rates to be effective April 1, 2010. Paragon will pay a penalty of twice the amount of any excess markup, plus costs of audit, for any non-compliance with this requirement that is not corrected after April 1, 2010.

As previously noted, on April 28, 2010, Paragon submitted to Covendis its revised rates and its new subcontractor agreements reflecting those rates. Covendis contends that the revised rates and renegotiated subcontractor agreements submitted by Paragon violated the margin cap, and, therefore, that there were genuine issues of material fact over whether Paragon breached the March Agreement.

We conclude that the uncontroverted evidence shows that Paragon did not breach the March Agreement. In reaching this conclusion, we need not resolve the parties' dispute regarding whether the revised rates and renegotiated subcontractor agreements proposed by Paragon on April 28 were consistent with the margin caps.

By its plain and unambiguous language, a breach would occur under the margin cap provision only if new billing rates for Paragon reflecting the margin cap were not

"implement[ed]" effective April 1, 2010, and Paragon would be penalized only if billing rates reflecting an "excess markup" were "not corrected" after that date. Here, however, it is undisputed that Covendis unilaterally entered what it deemed were the appropriate new billing rates for Paragon into the VMS, the State accepted those rates, and the State paid Paragon at those rates for the work thereafter performed by IT staff supplied by Paragon and its subcontractors. Hence, the uncontroverted evidence shows that the revised rates initially proposed by Paragon were never "implement[ed]" and that any purported error in those proposed rates was "corrected" by Covendis when it entered its own version of the rates into the VMS that were then paid by the State. In other words, the new billing rates for Paragon that were actually implemented for IT work with the State were the ones that Covendis considered proper under the March Agreement. Under these circumstances, Covendis has failed to show that Paragon breached the margin cap provision of the March Agreement, and the trial court committed no error in granting summary judgment to Paragon.[7]

[7] Covendis also argues for the first time on appeal that Paragon breached the margin cap provision by submitting its revised rates on April 28 rather than by April 1. "We will not consider new arguments in opposition to a motion for summary judgment raised for the first time on appeal." *Craig v. Bailey Bros. Realty*, 304 Ga. App. 794, 798 (2), n. 3 (697 SE2d 888) (2010). Furthermore, the March Agreement merely states that the new rates were to be "effective April 1, 2010," not that the rates had to be submitted to Covendis by that precise date. Consistent with the language

15

(b) *Payment of Subcontractors.* Covendis further contends that Paragon could be held liable for breach of contract because there is evidence that it withheld payments to some of its subcontractors even after Paragon had received payments from Covendis for the invoices at issue. Covendis does not claim to be a party or third-party beneficiary to the independent contractor agreements entered between Paragon and its suppliers, nor can it point to any express provision of the Supplier Agreement or March Agreement that regulates the timing of Paragon's payments to its subcontractors. Rather, Covendis relies solely upon Paragraph 25 of the Supplier Agreement, which provides:

> Supplier shall enter into written agreements with all Subcontractors which shall include provisions, where applicable, that parallel this Agreement[.] . . . Supplier shall furnish to Covendis for its review and approval, a copy of all executed written agreements with subcontractors.

Because other provisions of the Supplier Agreement obligated Covendis to pay Paragon whenever it received a full or partial payment from the State, Covendis asserts that Paragraph 25 required Paragon to pay its subcontractors whenever it

---

of the margin cap provision, the revised rates proposed by Paragon were to have an effective date of April 1, and the revised rates that were entered into the VMS by Covendis and were actually implemented had that same effective date.

received full or partial payment from Covendis. Because Paragon allegedly failed to pay its subcontractors after Covendis had fully or partially paid Paragon for those invoices, Covendis maintains that it can sue Paragon for breaching Paragraph 25 of the Supplier Agreement and by extension the March Agreement, which incorporated the terms and conditions of the Supplier Agreement.

We are unpersuaded. By its plain and unambiguous language, Paragraph 25 at most required Paragon to enter into agreements with its subcontractors that contained provisions that paralleled the Supplier Agreement and gave Covendis the right to review and approve those agreements. Nothing in Paragraph 25, however, gave Covendis a contractual right to then sue Paragon for allegedly breaching those provisions of its independent contractor agreements with its subcontractors. Thus, Covendis failed to show Paragon breached its contractual obligations *owed to Covendis* by allegedly failing to properly pay its subcontractors, and the trial court did not err in granting summary judgment to Paragon.

(c) *Background Verifications.* Covendis also argues that Paragon could be held liable for breach of contract for allegedly submitting false background verification reports on its IT staff. But Paragraph 12 of the March Agreement explicitly releases Paragon of any liability for the reports:

By entering into this Agreement, it is the intent of the parties that all claims by Covendis for noncompliance with requirements of the Supplier Agreement, or other applicable policies, rules, procedures, or requirements, related to background checks and subcontractor information as of the date of this Agreement are waived and released.

Covendis argues that Paragon is not entitled to the benefit of the release because it breached the March Agreement by violating the margin cap provision and failing to properly pay its subcontractors. However, as explained supra in Division 1 (a) and (b), we have determined that the uncontroverted evidence shows that Paragon did not breach its contractual obligations to Covendis with respect to the margin cap provision and its alleged failure to pay its subcontractors. Consequently, the trial court committed no error in granting summary judgment to Paragon.

2. *Covendis' Counterclaim for Fraud.* Covendis asserts that the trial court erred in granting summary judgment to Paragon on Covendis' counterclaim for fraud. According to Covendis, a jury could conclude that Paragon never intended to comply with the portions of the March 2010 Agreement concerning the margin caps and the purported obligation to pay subcontractors and thus fraudulently induced Covendis to enter into that contract.

"In general, a party alleging fraudulent inducement to enter a contract has two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud." (Citation and punctuation omitted.) *Megel v. Donaldson*, 288 Ga. App. 510, 515 (3) (654 SE2d 656) (2007). "To establish a claim for fraud in the inducement, . . . a plaintiff must prove both that the defendant failed to perform a promised act and that the defendant had no intention of performing when the promise was made." *Nash v. Roberts Ridge Funding, LLC*, 305 Ga. App. 113, 116 (1) (699 SE2d 100) (2010).

The record in this case shows that Covendis never attempted to rescind the March Agreement; instead, it sought only damages for the alleged fraud. Covendis, therefore, lost its opportunity to seek rescission as a remedy. See *Megel*, 288 Ga. App. at 515 (3). Nor can Covendis succeed on a claim for damages. As explained supra in Division 1, Covendis had failed to come forward with evidence creating a genuine issue of material fact regarding whether Paragon breached the March Agreement with regard to the margin cap or its payment of subcontractors. Thus, Covendis cannot show that Paragon "failed to perform a promised act," one of the necessary elements of a fraudulent inducement claim. See *Nash*, 305 Ga. App. at 116 (1). Accordingly,

the trial court committed no error in granting summary judgment to Paragon on Covendis' counterclaim for fraud.

3. *Paragon's Claim for Breach of Contract.* Covendis further contends that the trial court erred in granting summary judgment in favor of Paragon on Paragon's claim for breach of contract pertaining to the over $300,000 in funds paid by Covendis into the court registry. The record reflects that Covendis received the funds from the State for work that had been performed by Paragon-supplied staff beginning in the spring of 2010, but that Covendis then chose to withhold the funds from Paragon. Covendis maintains that it was entitled to withhold the funds because Paragon materially breached the Supplier Agreement and March Agreement, thereby excusing Covendis from remitting the funds to Paragon. Covendis also asserts that the funds should be maintained in the court registry to satisfy any set off that may be available to Covendis.

We disagree. As explained supra in Division 1, Covendis has failed to show that Paragon materially breached the Supplier Agreement and the March Agreement; thus, Covendis cannot show that its contractual duty to remit the funds to Paragon was excused, even if we assume that the alleged breaches would have excused nonpayment. Furthermore, because we have determined in Divisions 1 and 2 that

20

Covendis cannot succeed on any of its counterclaims, no set off is available in this case. It follows that the trial court did not err in granting summary judgment to Paragon on its breach of contract claim regarding the funds in the court registry.

4. *Paragon's Breach of Fiduciary Duty Claim against Covendis and Tsao.* Covendis next argues that the trial court erred in denying its motion for summary judgment on Paragon's claim for breach of fiduciary duty. The trial court concluded that there was evidence that Covendis had acted as Paragon's agent for the limited purpose of submitting new work proposals on its behalf using the VMS, and that Covendis breached its fiduciary duty owed to Paragon by submitting proposals reflecting new billing rates different from the ones proposed by Paragon on April 28. Covendis contends that the trial court's conclusions were incorrect and that no principal-agent relationship, and thus no fiduciary relationship, existed between the parties. We agree.

"It is well settled that a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." (Punctuation and footnote omitted.) *Ansley Marine Constr. v. Swanberg*, 290 Ga. App. 388, 391 (1) (660 SE2d 6) (2008). A fiduciary duty exists "where one party is so situated as to exercise a controlling

influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc." OCGA § 23-2-58. Paragon failed to present evidence raising an issue of fact as to the existence of such a relationship in this case.

"The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." OCGA § 10-6-1. A special agency can arise when one person, expressly or by implication, authorizes another to do a single act on his or her behalf. See *Foster v. Jones*, 78 Ga. 150, 156 (1 SE 275) (1887); *Lewis v. Citizens & Southern Nat. Bank*, 139 Ga. App. 855, 858 (1) (b) (229 SE2d 765) (1976).

The evidence here does not raise an issue of fact regarding the existence of a special agency or any other confidential relationship between Covendis and Paragon. The parties agreed that no agency would arise as a result of their contractual relationship. And at the time Paragon now contends that Covendis was acting as a special agent/fiduciary on its behalf, the parties were in disagreement about several facets of their business relationship and Paragon was effectively on probation. The

22

relationship between the parties, therefore, was tenuous, transitional, and at times adversarial.

And Paragon has cited no evidence upon which it reasonably could have relied to believe that Covendis was acting on its behalf, as opposed to acting out of its own interests or those of its client, the State. Even construing the evidence in Paragon's favor, the facts "do not show that [Covendis] exercised a controlling influence over [Paragon], and they do not show that the two [companies] interacted from positions of mutual confidence so that [Paragon] should have believed anything other than that their relationship was an arms-length – and even adversarial – one." *Irons v. CSX Transp., Inc.*, 224 Ga. App. 586, 588 (481 SE2d 575) (1997). Thus,

> [t]he transaction in this case . . . was not one in which the parties joined together as partners, promoters, joint venturers, or otherwise, to achieve a common business objective. Rather, the parties were engaged in a transaction *with each other* in an effort to further their own separate business objectives. Under such circumstances, one party was not under any duty to represent or advance the other's interests.

(Citations and punctuation omitted; emphasis in original.) *Allen v. Hub Cap Heaven, Inc.*, 225 Ga. App. 533, 537 (4) (484 SE2d 259) (1997). See also *Aon Risk Svcs., Inc. of Ga. v. Commercial & Military Systems Co.*, 270 Ga. App. 510, 512-513 (3) (a)

(607 SE2d 157) (2004); *Pardue v. Bankers First Fed. Sav. & Loan Assn.*, 175 Ga. App. 814-815 (334 SE2d 926) (1985) (no confidential relationship in lender/borrower relationship because parties have "clearly opposite interests," and even if one party undertakes to assist the other party, that party would not be entitled to rely on such undertaking). "Because this transaction was at arm's length, no confidential relationship existed. . . . In the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is created no confidential relationship by this alone." (Citations and punctuation omitted.) *William Goldberg & Co. v. Cohen*, 219 Ga. App. 628, 637 (6) (a) (466 SE2d 872) (1995).

Additionally, Paragon has pointed to no evidence supporting the existence of a special principal/agent relationship between the parties for entering the rates. "The distinguishing characteristic of an agent is that he is vested with authority, real or ostensible, to create obligations on behalf of his principal, bringing third parties into contractual relations with him." (Citations and punctuation omitted.) *Physician Specialists in Anesthesia, P. C. v. Wildmon*, 238 Ga. App. 730, 732 (1) (a) (521 SE2d 358) (1999). Here, the record is devoid of evidence that Paragon authorized Covendis to make representations on its behalf or to bind it contractually. Contrary to the dissent's assertion that Paragon thanked Covendis for an offer to enter the rates, Iyer

24

never responded to Tsao's statement that Covendis would enter them and thus never expressly authorized Covendis' actions. See emails in Appendix A. In fact, Iyer signed every e-mail with the phrase "Thank You" followed by her name, including those e-mails in which she was expressing disappointment at Covendis' actions or contesting the rates Covendis entered.

In any event, Paragon certainly did not authorize Covendis to enter the rates Covendis calculated into the system. Covendis' lack of authority is apparent from Paragon's immediate response disavowing the proposed rates entered by Covendis and requesting corrective action. Moreover, Covendis never represented that it was acting for Paragon in entering the revised rates into the AVS; Tsao simply stated that it would make the entries. And no evidence exists that Covendis ever would have entered Paragon's revised rates, which Covendis contends violated the March Agreement.

The record contains printouts of at least some of the entries containing the revised rates submitted by Covendis on April 28, 2010. All but one of these entries reflect that they were "[s]ubmitted on behalf of Paragon by Covendis."[8] The

---

[8] Most of the entries also reflected that they were made by "Paragon Technologiesadmin," which Tsao testified indicated that the entry was made by Covendis, as administrator and not by Paragon.

remaining entry reflects that it was "[m]odified by Covendis." All but one of the entries reflect that they were accepted on behalf of the state agency by Covendis.[9] Additionally, a supplier making an entry into the system is required to make certain verifications and representations, and Covendis purported to make such representations and verifications on Paragon's behalf.

These entries, however, do not raise a factual issue with regard to the existence of a special principal/agent or other confidential relationship between Paragon and Covendis. Rather, it appears that Covendis waited until the close of business on April 28, and with no word from Paragon, it undertook on its own initiative to enter the revised rates as it had calculated them and to accept these rates based upon its authority from the State. These actions were undertaken without Paragon's authority. Moreover, no issue of apparent authority arises, because the party accepting the revised rates was the same party who calculated them and entered them into the system.

Accordingly, even if Covendis acted improperly in entering the revised rates into the system and Tsao acted improperly in authorizing this action, these actions do

---

[9] Tsao explained in his deposition that in order for the bill rates to be entered into the system, they have to be accepted by the State.

not constitute the breach of any fiduciary duty to Paragon. Thus, we must reverse the trial court's denial of summary judgment on Paragon's claim for breach of fiduciary duty against Covendis and Tsao.

*Case No. A12A2449*

5. *Paragon's Fraud Claims.* Paragon contends that the trial court erred in granting summary judgment in favor of Covendis, Tsao, and Crowley on Paragon's claims for fraud. Paragon asserts that Covendis, Tsao, and Crowley committed fraud by misrepresenting to Paragon's subcontractors that Paragon was no longer an approved supplier with the State and that Covendis had fully paid Paragon. Paragon further asserts that Covendis and Tsao committed fraud by misrepresenting to the State the billing rates for Paragon through the entry of false work proposals into the VMS on April 28. The trial court granted summary judgment to the defendants on these fraud claims on the ground that Paragon had failed to present evidence of the key element of reliance.

We conclude that the trial court committed no error. "The tort of fraud has five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4)

justifiable reliance; and (5) damages." *ReMax North Atlanta v. Clark*, 244 Ga. App. 890, 893 (537 SE2d 138) (2000). The general rule in Georgia is that "actionable fraud must be based upon a misrepresentation made *to* the defrauded party, and relied upon *by* the defrauded party." (Emphasis in original.) *Fla. Rock & Tank Lines, Inc. v. Moore*, 258 Ga. 106 (1) (365 SE2d 836) (1988) (hereinafter, "*Florida Rock*"). See *Steimer v. Northside Bldg. Supply Co.*, 202 Ga. App. 843, 845 (1) (415 SE2d 688) (1992).

Paragon concedes that its fraud claims, which involve alleged misrepresentations made to subcontractors and to the State, do not fit the traditional scenario where the misrepresentation is made to the defrauded party who then relies upon it to his or her detriment. Nevertheless, Paragon contends that its fraud claims fit within the exception for misrepresentations made to a third party recognized by our Supreme Court in the *Florida Rock* case.

In *Florida Rock*, the defrauded party was a trucking company whose driver delivered fuel to a gasoline service station. See *Moore v. Fla. Rock & Tank Lines, Inc.*, 183 Ga. App. 520, 520-521 (1) (359 SE2d 356) (1987).[10] The station owner

_____

[10] Although the Supreme Court in *Florida Rock* reversed this decision, it relied upon the Court of Appeal's statement of the underlying facts. See *Florida Rock*, 258 Ga. at 106.

28

promised to pay for the gasoline in the future after the delivery, but the truck driver rejected the offer and prepared to pump the gasoline he had delivered to the service station back into his truck. Id. at 521 (1). The station owner then contacted Exxon U.S.A., Inc., which had supplied the gasoline to the trucking company, and made a similar promise to pay for the gasoline in the future. Id. Exxon agreed to the offer of future payment and then called the service station and spoke with the truck driver. Id. Relying upon Exxon's authorization, the truck driver left the gasoline in the station owner's storage tanks without collecting for the delivery. Id. The station owner subsequently sold the gasoline, but never paid Exxon for it, and, in fact, had never intended to pay for the gasoline. Id. The trucking company ultimately bore the loss of the station owner's failure to pay and sued the owner for fraud. Id. at 522 (1).

Based upon this factual scenario, our Supreme Court concluded that the trucking company had an actionable claim for fraud against the station owner, even though the owner's misrepresentation that ultimately caused the harm to the trucking company was made to Exxon, a third party. *Florida Rock*, 258 Ga. at 107 (3) - (4). The Court explained that the necessary element of reliance is satisfied in cases involving a misrepresentation to a third party "where . . . A, having as his objective to defraud C, and knowing that C will rely upon B, fraudulently induces B to act in

29

some manner on which C relies, and whereby A's purpose of defrauding C is accomplished." Id. at 107 (4).

Applying the facts and analysis of *Florida Rock* to the present case, we conclude that Paragon construes *Florida Rock* too broadly and has failed to come forward with sufficient evidence to support its fraud claims. It is true that under *Florida Rock*, the defendant does not necessarily have to make the misrepresentation to the defrauded party. But *Florida Rock* makes clear that when the misrepresentation is made to a third party, the misrepresentation must induce the third party "to act in some manner *on which [the defrauded party] relies*." (Emphasis supplied.) *Florida Rock*, 258 Ga. at 107 (4). Reliance, in the context of fraud, means to induce someone to act or forbear from acting. See *Steimer*, 202 Ga. App. at 845 (1). Thus, for a misrepresentation to a third party to constitute actionable fraud under *Florida Rock*, the defrauded party must be induced to act or forbear from acting as a result of the misrepresentation made to the third party. Here, there is no evidence that Paragon was induced to act or forbear from acting in any manner as a result of the alleged misrepresentations made by Covendis to the subcontractors or to the State. Accordingly, Paragon failed to assert an actionable claim for fraud under the test enunciated in *Florida Rock*.

30

The result in this case is supported by our decision in *Pyle v. Pyle*, 243 Ga. App. 398, 401 (3) (531 SE2d 738) (2000). In *Pyle*, the defendants allegedly made false representations regarding the title to a cemetery plot to a cemetery superintendent, who then conveyed the plot to one of the defendants rather than to the plaintiff based on the misrepresentations. Id. at 401 (3). The plaintiff sued the defendants for fraud based on the misrepresentations to the cemetery superintendent, but this Court, citing to *Florida Rock*, concluded that the trial court had properly granted summary judgment to the defendants on the plaintiff's fraud claim. Id. In reaching this conclusion, we noted, among other things, that the plaintiff had failed to prove reliance. Id.

In *Pyle*, while the plaintiff suffered the economic loss of not having property conveyed to her, there was no evidence that she was induced to act or refrain from acting as a result of the misrepresentation to the cemetery superintendent. Thus, the plaintiff could not prove reliance and could not satisfy the test set forth in *Florida Rock*. Similarly, while Paragon may have suffered economic loss as a result of the alleged misrepresentations made to its subcontractors and the State, there is no evidence that it was induced to act or refrain from acting as a result of the

misrepresentations made to those third parties. Hence, Paragon, like the plaintiff in *Pyle*, cannot establish the necessary element of reliance.

Lastly, Paragon cites to the fraud case of *Potts v. UAP-GA AG CHEM, Inc.*, 256 Ga. App. 153, 155-156 (1) (567 SE2d 316) (2002) in an effort to avoid the element of reliance. In *Potts*, the defendant made the alleged misrepresentations to the plaintiff's physician, who then relied on the misrepresentation in his decision about how to treat the plaintiff. Id. In reversing the grant of summary judgment to the defendant, we held that "[w]here a person . . . is entrusted with discretion in caring for plaintiff's interests, a misrepresentation to that person . . . may be the basis for a fraud action where the person in reasonably relying upon the misrepresentation acts to harm plaintiff's interests." Id. at 156 (1).

*Potts*, involving misrepresentations made in the context of a doctor-patient relationship, is clearly distinguishable from the instant case. Paragon's subcontractors and the State clearly were not "entrusted with discretion in caring for [Paragon's] interests" but simply were third parties involved in a series of arms-length commercial transactions that addressed IT staffing for state agencies. It follows that the subcontractors and the State are in no sense analogous to the doctor in *Potts*, and Paragon's reliance on that case is misplaced.

6. *Paragon's Negligent Misrepresentation Claim.* Paragon further contends that the trial court erred in granting summary judgment in favor of Covendis, Tsao, and Crowley on Paragon's negligent misrepresentation claim. Paragon's negligent misrepresentation claim mirrored its fraud claims but without the allegations of scienter. See *Holmes v. Grubman*, 286 Ga. 636, 640-641(1) (691 SE2d 196) (2010) ( "[T]he only real distinction between negligent misrepresentation and fraud is the absence of the element of knowledge of the falsity of the information disclosed.") (citation and punctuation omitted). Accordingly, for the same reasons discussed in Division 6, Paragon's negligent misrepresentation claim also must fail. See *Hightower v. Century 21 Farish Realty*, 214 Ga. App. 522, 524 (2) (448 SE2d 271) (1994) ("The same principles apply to both fraud and negligent misrepresentation cases."). The trial court thus committed no error in granting summary judgment to Covendis on this claim.

*Judgment affirmed in part and reversed in part. Miller, P. J., Doyle, P. J., Ray and Branch, JJ., concur. Barnes, P. J., and McFadden, J., concur in part and dissent in part.*

33

# APPENDIX "A"

Please make appropriate changes to the proposals in the GAVMS so all the April times are invoiced accurately and timely.

If anything is required from us to update the system, please send us detailed instructions so we can do so accurately without any disruptions.

Thank you.

Madhu Iyer
Paragon Technologies, Inc.
4898 S Old Peachtree Rd, Suite 200, Norcross GA 30071
2008 Top 50 Diversity Company in GA
(770) 446-7077 x222
(770) 441-6451 Fax
www.paragontechnologies.com

On Mon, Apr 26, 2010 at 11:33 AM, Madhu Iyer <madhu@paragontechnologies.com> wrote:

Hello! Raymond,

We have received your request for executed subcontract agreements for our subcontractors and the new bill rate/pay rates effective April 1st for all our active contracts. You should have these information sent to you by EOB Wednesday, April 28th.

Please let me know if you should need anything in the meanwhile regarding the revised rates.

Thank you.

Madhu Iyer
Paragon Technologies, Inc.
4898 S Old Peachtree Rd, Suite 200, Norcross GA 30071
2008 Top 50 Diversity Company in GA
(770) 446-7077 x222
(770) 441-6451 Fax
www.paragontechnologies.com

On Thu, Apr 22, 2010 at 11:12 PM, Raymond Tsao <rtsao@covendis.com> wrote:

Hi Madhu –

Per the terms of our March 1st agreement. Paragon was to have provided Covendis with the new rates that were to be effected April, 1st per the terms of the agreement. To date, we have not received them.

Thank you for sending them, and we shall adjust the rates in the system effective April 1st, which will be reflected in the next invoice.

COV000005

34

A12A2448. UWORK.COM, INC. et al. v. PARAGON
TECHNOLOGIES, INC.

A12A2449. PARAGON TECHNOLOGIES, INC. v.
UWORK.COM, INC. et al.

BARNES, Presiding Judge, concurring in part and dissenting in part.

Paragon presented sufficient evidence to withstand summary judgment on its claims for breach of fiduciary duty brought against Covendis and its CEO, Raymond Tsao. Because the majority concludes otherwise, I respectfully dissent to Division 4 of the majority opinion in Case No. A12A2448.[1]

*Paragon's Breach of Fiduciary Duty Claim against Covendis.* In denying summary judgment to Covendis on Paragon's breach of fiduciary duty claim, the trial court concluded that there was some evidence that Covendis had acted as Paragon's agent for the limited purpose of submitting new work proposals on its behalf using the Vendor Management System ("VMS"), and that Covendis breached its fiduciary

---

[1] I concur fully in Divisions 1, 2, and 3 in Case No. A12A2448, and I concur fully in Case No. A12A2449.

duty owed to Paragon by submitting proposals reflecting new billing rates different from the ones proposed by Paragon on April 28, 2010. Reversing the trial court, the majority finds that there was no evidence of a special agency relationship, and thus no evidence of a fiduciary relationship, between Covendis and Paragon. I respectfully disagree with the majority.

An agency relationship "arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." OCGA § 10-6-1. "A special agent is one to whom there is a delegation to do a single act." (Citation and punctuation omitted.) *Lewis v. Citizens & Southern Nat. Bank*, 139 Ga. App. 855, 858 (1) (b) (229 SE2d 765) (1976). See *Foster v. Jones*, 78 Ga. 150, 156 (1 SE 275) (1887). And "[w]here an agency relationship exists, the agent has a fiduciary duty to his principal." *Wright v. Apartment Investment & Mgmt. Co.*, 315 Ga. App. 587, 592 (2) (a) (726 SE2d 779) (2012). Whether an agency relationship exists, and thus whether a fiduciary duty may be found, "is generally a factual matter for the jury to resolve." (Citation and punctuation omitted.) Id.

In the present case, there was evidence that on April 22, 2010, Covendis emailed Paragon, requesting that it submit revised billing rates per their March 1,

2

2010 Agreement. Although the Supplier Agreement contemplated that Paragon would enter work proposals with rate information into the VMS, Covendis deviated from the Supplier Agreement and indicated in its April 22 email that it would "adjust the rates in the system" upon receiving the revised rates from Paragon. Paragon responded on April 26, thanking Covendis and stating that it would supply the new rates to Covendis on April 28. Subsequently, on April 28, Covendis entered the VMS and submitted several new work proposals "on behalf of Paragon by Covendis." In entering the work proposals, Covendis also made certain representations and verifications to the State on Paragon's behalf.

A jury could infer from this evidence the existence of a special agency relationship. The email exchange between Covendis and Paragon, when construed in the light most favorable to Paragon, would support a finding that Covendis offered to enter the VMS and submit new work proposals for Paragon containing the revised billing rates that would be proposed by Paragon, and that Paragon agreed to this arrangement and authorized Covendis to act on its behalf for this limited purpose. Moreover, the fact that Covendis expressly stated that it was acting "on behalf of Paragon" and made representations and certifications on Paragon's behalf when it subsequently entered work proposals into the VMS would buttress a finding by the

jury of a special agency relationship. In light of the evidence of such a relationship, there was at least some evidence that Covendis owed a fiduciary duty to Paragon in submitting the new work proposals onto the VMS on April 28.

The majority, in contrast, finds that a special agency relationship should not be inferred from the email exchange between the parties coupled with the other evidence in the case. But it is well-settled that on summary judgment, "all reasonable conclusions and inferences drawn from the evidence are construed in the light most favorable to the non-movant." *Spectera, Inc. v. Wilson*, 317 Ga. App. 64, 66 (730 SE2d 699) (2012). In addressing motions for summary judgment,

> we must remain mindful of the jury's role in the process to resolve any and all conflicts in the evidence. It is the jury, not the court, which is the factfinding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, . . . and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. . . . From this perspective, it is preferable not to have . . . [trial or appellate courts] stand in the shoes of the several men and women of various backgrounds who make up a jury and determine what inferences they may draw from the evidence.

(Citations and punctuation omitted.) *Service Merchandise v. Jackson*, 221 Ga. App. 897, 898 (1) (473 SE2d 209) (1996). It may well be true that a jury, taking into

4

account the email exchange and other evidence in this case, may select among the competing inferences and ultimately find that a special agency relationship was never created.[2] But that is an issue for trial, not for summary judgment.

In addition to the evidence of a special agency relationship and thus of a fiduciary duty owed by Covendis to Paragon, there was evidence that Covendis breached that duty. "An agent is . . . under a duty to obey his principal's instruction" and is bound by restrictions that his principal has placed on the agency. *Stanford v. Otto Niederer & Sons, Inc.*, 178 Ga. App. 56, 57 (1) (341 SE2d 892) (1986). Here, there was evidence that on April 28, Covendis entered into the VMS work proposals on Paragon's behalf that contained revised rates that it deemed appropriate, rather than the rates submitted to it by Paragon on that date. Moreover, when Paragon instructed Covendis to enter the VMS on that same date and change the rates on the

---

[2] For example, the majority asserts that Paragon's April 26 email should not be construed as thanking Covendis for offering to enter the revised rates into the VMS on Paragon's behalf because Paragon routinely ended its emails to Covendis with the phrase "thank you." But Paragon's April 26 email can be construed in more than one way. One way to construe Paragon's April 26 email – in which Paragon responded to Covendis's April 22 email by saying "thank you" and agreeing to provide by April 28 the revised rates requested by Covendis so that it could "adjust the rates in the system" – is that Paragon was authorizing Covendis to enter revised rates into the VMS on Paragon's behalf. Because Paragon's April 26 email is capable of competing constructions, the question of how to construe it should be left to a jury.

5

work proposals to reflect the ones that had been submitted by Paragon, Covendis refused.[3] Under these circumstances, a jury could find that Covendis breached its fiduciary duty owed to Paragon. Consequently, I would affirm the trial court's denial of summary judgment to Covendis on Paragon's claim for breach of fiduciary duty. See, e.g., *Nat. Council of Compensation Ins. v. Strickland*, 241 Ga. App. 504, 506-507 (1) (526 SE2d 924) (1999) (genuine issue of material fact existed over whether defendant was acting in fiduciary capacity and breached its duties owed to plaintiff, where there was evidence that plaintiff submitted insurance application to defendant so that coverage could be assigned to an insurer, and defendant changed the application without plaintiff's knowledge or consent).

*Paragon's Breach of Fiduciary Duty Claim against Tsao.* Paragon also asserted a breach of fiduciary duty claim against Tsao, Covendis's CEO, in his individual capacity. The trial court denied his motion for summary judgment on this claim, and, unlike the majority, I would affirm.

The general rule is that "[a] corporation possesses a legal existence separate and apart from that of its officers . . . so that the operation of a corporate business

---

[3] The emails reflecting this exchange between Paragon and Covendis are not included in the majority's "Appendix A."

6

does not render officers . . . personally liable for corporate acts." *Clay v. Oxendine*, 285 Ga. App. 50, 57 (3) (645 SE2d 553) (2007). But "a corporate officer who takes part in the commission of a tort committed by the corporation is personally liable [for the tort]." *Almond v. McCranie*, 283 Ga. App. 887, 889 (2) (643 SE2d 535) (2007). Furthermore, even if the corporate officer did not commit the tort himself, if "he specifically directed the particular act to be done," he can be held personally liable. (Citation and punctuation omitted.) *Jennings v. Smith*, 226 Ga. App. 765, 766 (1) (487 SE2d 362) (1997). Here, there was evidence that Tsao personally directed other Covendis employees to enter the VMS on April 28 and submit the Paragon work proposals reflecting new billing rates that Covendis deemed appropriate rather than the rates submitted by Paragon. Morever, Tsao sent the email to Paragon specifically refusing to adjust the new rates in the VMS to reflect the ones proposed by Paragon. Given this evidence, the trial court did not err in denying summary judgment to Tsao on Paragon's claim for breach of fiduciary duty. See *Almond*, 283 Ga. App. at 889 (2); *Jennings*, 226 Ga. App. at 766 (1). Therefore, I would affirm the trial court and let the matter proceed to a jury for resolution.

I am authorized to state that Judge McFadden joins in this opinion.

ON MOTION FOR RECONSIDERATION

In its motion for reconsideration, Paragon challenges our holding that the trial court erred in denying Covendis' and Tsao's motion for summary judgment on Paragon's claim of breach of fiduciary duty. We find no merit to Paragon's arguments regarding the existence of a special agency, either actual or apparent, but write on motion for reconsideration to address Paragon's reliance upon the case of *National Council on Compensation Ins. v. Strickland*, 241 Ga. App. 504 (526 SE2d 924) (1999), a case cited by the dissent but not previously cited by Paragon, to assert that questions of fact exist regarding Paragon's claim that Covendis acted with apparent authority in entering the work proposals into the VMS on April 28, 2010.

Paragon argues that under the facts of this case, "because it would appear to the State that Paragon agreed to [the proposals entered by Covendis], Covendis had apparent authority [vis-a-vis] the State to enter proposals on Paragon's behalf." But as previously stated, no issue of apparent authority arises because Covendis both

entered the proposals and accepted them on behalf of the State. Covendis took this action without authority from Paragon, and the State, as principal, is charged with knowledge of all the facts known to its agent Covendis, including its lack of authorization, at the time it undertook this action. See OCGA § 10-6-58 ("Notice to the agent of any matter connected with his agency shall be notice to the principal."). See also *Gustafson v. Cotton States Mut. Ins. Co.*, 230 Ga. App. 310, 312 (496 SE2d 346) (1998). Although an exception to this statutory principle arises "[w]here an agent shall conspire with the other party" against the principal, OCGA § 10-6-59, that exception does not apply here because the lower rates Covendis calculated and entered benefitted the State and there is no evidence that Covendis and Paragon conspired against the State.

Nothing in the factually distinguishable *Strickland* decision dictates a different result. In that case, Strickland sought to obtain worker's compensation insurance covering his employees and himself through the Matrix Insurance Agency. After Matrix was unable to obtain such coverage independently, it applied on Strickland's behalf to obtain the coverage from the Georgia Workers' Compensation Assigned Risk Insurance Plan (the "Assigned Risk Pool"). Under a contract with the Georgia Insurance Commissioner, the National Council on Compensation Insurance, Inc.

9

("NCCI") served as the administrator for the Assigned Risk Pool. A NCCI account analyst determined that Strickland's application contained insufficient payroll for his inclusion within the worker's compensation coverage. When the analyst called Matrix to resolve the problem, she testified that she received instructions from an unidentified person to exclude Strickland from coverage. Without contacting Strickland for confirmation, the NCCI analyst physically altered the application to indicate that Strickland wished to be excluded from coverage and assigned the application to an insurer who wrote the policy. When Strickland was subsequently injured and was denied coverage, he brought suit against NCCI and Matrix. *Strickland*, 241 Ga. App. at 504-505.

This Court found that issues of fact remained as to the role NCCI occupied when it changed Strickland's application and whether NCCI was acting in reliance upon instructions from Matrix. *Strickland*, 241 Ga. App. at 506 (1). If the jury found that NCCI was acting as an agent or subagent in changing the application, "NCCI acted in a fiduciary capacity for [Strickland], as his special agent for such limited purpose, *with the assigned insurer* . . . ." (Citation omitted and emphasis supplied.) Id. at 506-507 (1). In that instance, then NCCI would have acted "with apparent

10

authority in presenting the altered application for assignment with [the insurer] . . . ." Id. at 507 (1).

In contrast, Paragon did not authorize Covendis to submit the work proposals; rather, Covendis simply informed Paragon that it would enter the rates and then undertook on its own initiative to submit proposals with Covendis-calculated rates. Only after Covendis had entered these proposals did Paragon provide its own calculations and expressly authorize Covendis to enter work proposals at Paragon's rates. Covendis refused to do so. Thus, no issue of actual or voluntary agency arises. Additionally, in *Strickland* the NCCI submitted Strickland's application to a third party, which relied upon NCCI's apparent authority in issuing worker's compensation coverage. Here, Covendis did not present anything to a third party for its consideration; rather, it accepted on behalf of the State the very proposals that it had entered. Thus, as noted above, no issue of apparent authority arises. Accordingly, *Strickland* does not support Paragon's claim for breach of fiduciary duty.

*Motion for reconsideration denied.*

11